We'll call the next case, number 20-1-2258, Blackburn v. Shire. Looks like we have Mr. Walker for the appellant, who's reserved five minutes for rebuttal, and Mr. Peck for the appellee. Mr., oh, Mr. Waller, I'm sorry. Mr. Waller, you may proceed when you're ready. May it please the court, I'm Jay Waller, one of the lawyers for the appellant. We understand that oral argument is not a matter of right, it is a privilege, and we appreciate this opportunity. I would like to go to what we believe is the heart of the matter, and that is the district court's order granting summary judgment based on causation in the learned intermediary context. Of course, summary judgment is a lethal weapon, and we believe it is appropriate here. Counsel, can I interrupt you and ask you about something that I am a little concerned with before you get to the causation issue? And I certainly wanna hear what you have to say on causation. But I wanna ask something more fundamental than that. So this is brought under a judicially created doctrine in Alabama, and I'm gonna butcher the name, but the Alabama Extended Manufacturer's Liability Doctrine, is that correct? Yes, Your Honor. All right, under that doctrine, has there ever been an Alabama appellate case, either at the Civil Court of Appeals or the Alabama Supreme Court, that has approved the theory that you have in this case, which is that there really wasn't a failure to warn with regard to use of the drug, but a failure to warn on the testing to make sure that you didn't suffer any of the consequences that were in fact disclosed? And secondly, under that doctrine, has there ever been a causation theory approved by any of the Alabama appellate courts  not that I would not have taken this medicine, but that my doctor would have done something different than he did, in this case, have tested more often or ordered more tests than periodic? Has that ever been approved in an Alabama court? I know you all talk about and cite federal district court cases. I've seen those. Certainly the federal district court here approved this theory, citing federal district court cases. But I wonder if that you know of, and please point me to it, of any Alabama case that's approved this sort of theory of both liability and causation under the Alabama Extended Manufacturer's Liability Doctrine. Yes, Your Honor. I believe that case of Hicks versus Commercial Union, which we cited at 652 Southern 211 is applicable. Well, that case was a product liability model involving whether instructions for how to use a pipe stopper with jaws, whether those instructions were adequate. And the Alabama Supreme Court affirmed or held that an instruction for use was appropriate. But counsel, this isn't, I understand completely. And certainly if this were not giving any instruction that kidney disease could result from this, if that were out of the instructions, then that would be clear here. But I guess my question is, this isn't an issue of lack of failure. This isn't an issue of liability because there was a failure to warn that a specific use would cause something. Everyone agrees that kidney disease was disclosed and that it was in the manual there. This is a testing regime that doesn't affect use, but that affects the testing regimen that a doctor is going to use in prescribing this. Has that sort of thing been authorized? Well, Your Honor, first of all, almost all of the cases are in federal court because the drug companies removed federal court, number one. Number two, I would respectfully take a slightly different view from the court's observation that instructions don't affect use. Of the instructions are critical to safe use. The Alabama statute relating to AML, which of course is also a part of case law, is 6-5-501. It defines a product liability action as explicitly including instructions. And I think that Judge Proctor was entirely correct when he indicated that proof of causation may take the form of evidence that the physician, although the physician still would prescribe the drug, the physician would have changed his or her behavior in a way that it resulted in a different outcome. And I can address that. There's Dr. Winston's affidavit and a lot of evidence. I would also point, Your Honor, to 21 CFR 201-57C, which we've cited, which is mandatory. Judge Proctor referenced it as being a recommendation. And this relates again to safe use and what the drug companies have got to include in a label. That regulation is mandatory with respect to what must be in a label. And that regulation, it's actually 57 little c, I think six double little i. It is mandatory that the drug manufacturer include reasonable instructions for safe use, including the recommended frequency of laboratory testing. Now, the fact that the regulation uses the word recommended is the reason that is also in the label. They're paraphrasing the regulation, but it is mandatory that the drug manufacturer provide safe instructions for safe use. I hope I've answered, Your Honor. Counsel, I definitely want you to go to the causation issue. I appreciate you giving me such a thorough answer. Thank you, Your Honor. So the district court's order is based entirely on causation in the learned intermediary context. On page 16 of its order, the district court said that because Dr. Ferrante did not follow instructions for prior renal evaluation before prescription, quote, so Mr. Blackburn cannot prove that Dr. Ferrante would have read and heeded an alternative instruction, close quote. With respect and deference that is fatally flawed and I'll address first Dr. Ferrante and then Mr. Blackburn because the district court goes on to say on the following page, there is no evidence that Blackburn would have complied with such an instruction. I'm gonna refer to it as an OCTASA type instruction if that's okay. That's the similar or specific animal testing. OCTASA is the label that required testing in the United Kingdom every 30 days. So what the district court did not consider at all was Dr. Ferrante's testimony regarding his conversation with Dr. Young in August of 2013 when Dr. Young referred Mr. Blackburn to Dr. Ferrante. Dr. Ferrante testified, as I believe we make clear, that he asked Dr. Young about blood work and Dr. Young specifically told him that he had done a workup, he'd done blood work and quote, everything checked out okay. Now, Dr. Ferrante testified that it was within the standard of care to rely on information from a prescribing physician. Our gastroenterology expert, Dr. Janik confirmed that that is within the standard of care. There is no evidence from Shia that Dr. Ferrante deviated from the standard of care when he relied upon Dr. Young. And so it's just apples and oranges. There is no case where a doctor complies with the standard of care and then a court rules on summary judgment as a matter of law that the doctor's testimony that he would have provided the instructions for safe use urged by the plaintiff, that the doctor would not have done that. In other words, the district court rejected Dr. Ferrante's testimony, that he knew about the label, he understood periodic to mean for one year that he relies on the label for safety, that he would have followed an octacetide instruction. He would have told Mr. Blackburn that the instructions were important for safe use and that he had been prescribing Liala for many years and he knew about the periodic labeling in advance. May I take one minute from my rebuttal time just to address approximate cause as to Mr. Blackburn? Yes, you may take that from your rebuttal time. So in our view, not preparing, doing prior renal is no basis to completely disregard Dr. Ferrante's testimony. As to Mr. Blackburn, he testified that he was aware of the label and the periodic monitoring, that he understood that to be a year to 18 months, that he believed that he was following that protocol. That alone would support an inference under Daniels versus Twin Oaks, that he would have followed the label with octacetide instructions. But there's much more evidence, and I'm gonna say it very briefly, that the trial court never considered. In the prior year, it's nowhere in the court's oil, in the prior year, Mr. Blackburn went to see, he would visit Dr. Young, there was blood work done in March of 2012 and that revealed elevated PSA. Dr. Young told Blackburn to come back in six months for more blood work. Blackburn complied with that direction, came back in September of 2012, had blood work, which revealed his PSA was okay. That's not fact. I'm sorry, that's not speculation. That is absolutely a fact that that happened and clearly supports an inference that he would have followed a parallel or similar recommendation for blood work with respect to Leona. And I think perhaps one of the clearest cases is the NRA Tylenol case. Mr. Waller, you're now two minutes into your rebuttal time, so you may conclude what you're saying, but just to give you a warning. Thank you, Your Honor. The NRA Tylenol was decided under Alabama law in a Pennsylvania MDL. In that case, the patient had died and the court explained that inferences could be drawn from what the deceased patient's relative said about how she would take drugs. And I think that case clearly allows an inference under the Daniels Bandit that Mr. Blackburn would have followed an instruction to get blood work. Thank you, Your Honor. Thank you, Mr. Waller. Mr. Robinson, let's give Mr. Waller three minutes for rebuttal. Mr. Peck, you may begin when you're ready. Oh, I'm sorry. Thank you, Your Honor. Good morning. May it please the court. I'm Jeff Peck, representing Neapolis here. Your Honors, the learned intermediary doctrine as this court recognized in Tutwiler is well settled in Alabama. And it is well settled in Alabama that the learned intermediary doctrine is an absolute defense for a failure to warn claim in a prescription drug case. That's at page 653 of Wyeth v. Weeks. That's what the Supreme Court of Alabama said. And it said that the duty is for the prescription drug manufacturer to warn of risk. And there is no dispute, as Judge Luck pointed out here, that the risk of kidney failure, the risk of interstitial fibrosis, those kidney impairment were all warned about in the label. And then what- Let me ask you to address this. So the underlying tort here, the way I understand the doctrine that the Alabama Supreme Court created is that it's ultimately rooted in negligence, right? The idea that to put an unsafe product on the market and then drugs are inherently unsafe is what the Alabama Supreme Court has said. To put a product like that on the market without giving appropriate warnings is per se negligent. It's kind of the idea of the doctrine. Given that it's rooted in negligence, why would the duty be so limited to just warn of risk and not potentially a broader duty to warn of something like this testing that would mitigate a risk? Well, first of all, Your Honor, I don't think it's negligence per se in this situation. It is a strict liability claim that has negligence elements to it. I agree with you on that. But the reason that it's limited in that way is because the courts recognize that those other things that follow after a physician has decided to prescribe a drug are in the practice of medicine. They are those things that are bound up with knowing the patient, knowing the other things that are going on with that patient. And that's why what the Alabama Supreme Court said is there's a two-part test to this. One is if the plaintiff is going to overcome it. One is it has to show that the prescription drug company failed to warn the physician of a risk not otherwise known to the physician. That's number one. That's not the case here. And so the plaintiffs are out on that in terms of their failure to warn claim. Number two, it has to show that the prescribing physician would not have prescribed the drug or medication to the patient because that is the risk tied in. And the Alabama Supreme Court has been very definitive about that and very specific. And I recognize to your point, Judge Brasher, that the district court said, well, maybe there could be a situation where the drug is prescribed and then there are other things down the road, but that's not what we've said. And the reliance- I mean, Weeks wasn't a case about this, right? About the idea of a testing regimen that could have been warned about, right? That issue, I agree. That issue was not specifically presented in Weeks, but what Weeks did recognize is that after the prescribing decision is made, all those other things fall into the practice of medicine. If you look at the language that it quotes from Reyes, and that was quoted earlier by the Alabama Supreme Court in Stone, it talks about how once that physician is advised of the risk and then makes the decision that the things that follow on are part of the patient-physician relationship. They're not part of the drug company's duty. Weeks also isn't an Alabama extended medical liability doctrine case, is it? It is an Alabama extended manufacturers liability doctrine case, I agree. You agree it's not? Pardon me? You agree that it's not? It is brought under that, yes. Weeks was? No, no, I'm sorry. I thought you were asking about this case. No, I know what this case is. I'm familiar. I'm sorry, I misunderstood. Weeks was not a AEMLD case, right? Correct, it was a misrepresentation case. Does that matter for what the question that Judge Brasher asked you, which is not only did the facts not present itself, in other words, that wasn't a testing regimen case, but it was a generic drug case from the best that I can tell. But in addition, it's not even a doctrine case. Does that matter for the learned intermediary doctrine? It does, Your Honor, for two reasons. Number one, what was going on in Weeks, as you know, is that the court was articulating the boundaries of when a innovator liability or an innovator company could be targeted for a misrepresentation when the person took the generic drug. In the course of that, the court specifically articulated what the learned intermediary doctrine was in order to talk about how that might relate to the whole misrepresentation issue. Well, let me ask it this way, and I tend to agree with your reading of at least the learned intermediary doctrine part of the opinion, but do you know of, and I'm asking you as an officer of the court, any Alabama case that has extended causation in the products liability context to a I would have changed my conduct as opposed to I wouldn't have used the product kind of theory? Oh, I'm sorry, I thought you were finished. I apologize. Sorry. I do not know of any case in the prescription drug area, which is what we're dealing with here. What do we make of McClintock? Well, in McClintock, I assume you're talking about the 1993 case there, the first one. I'm talking about the hour. I'm sorry, you're right. McClintock actually was the title in the 1993. There was a second case that came under a different plaintiff. The difference with McClintock, your honor, is that in that case, Bayer defended specifically on the basis that the plaintiff would have been the decision maker. So in other words, they made their defense on the basis that she would not have gone through the procedure if it had been disclosed to her by the physician. And so what the court said, what the 11th circuit said in that case- I thought the causation theory in part was that with regard to the product liability, the physician said I would have given different warnings if I had known what I now know or what should have been told to me, right? You're correct, your honor. But it's in terms of the causation analysis, what happened is, and this drove it, is this part of it where Baxter argues that its warning was clear that a closed capsulotomy could rupture the implant, that Ms. Toole admitted that had the manufacturer's warning been conveyed to her, she would not have consented to implant surgery. So Bayer was saying this was on the doctor for not conveying it to her. We're defending on the basis that she would have been the decision maker. And of course, what the doctor said and the way it went back is, if I had gotten more from Bayer, I would have passed it on to her. That's very different from what's going on here and certainly our position. Our position is the doctor is the decision maker on the learned intermediary doctrine. For whatever reason, Bayer made the arguments that it did in McClintock. Okay? All right, I wanna fast forward a little bit to causation. And I'm gonna say upfront that I am troubled by the district court's order here on causation. First, as I understand our case law, self-serving statements, to the extent this is a self-serving statement, and that seems an odd categorization since the doctor here is not a plaintiff or a party in any way, but that a self-serving statement can't be a basis for summary judgment. I think we've said exactly the opposite of that in the summary judgment context. And in addition, your opposing counsel talked about some of the causation theory with regard to Mr. Blackburn himself, but he testified in deposition, as I recall, and I'm referring to docket entry 160-157, when asked, or he answered, quote, well, I followed the protocol of periodic testing. If it had said on the packet that you needed to have interval testing, testing after 30 days, then again, also after every 30 days thereafter for 90 days, and then for a year, I would have done that. Why is that not sufficient evidence for Mr. Blackburn? And why is the doctor's evidence that he would have followed the instructions that they have, testing instructions that they have been different, not enough to meet, at least for a summary judgment, at least to defeat summary judgment? If I may, your honor, I'm gonna take the doctor first on that. And one thing I'd like to point out just very quickly is the, because it came up in the reply memorandum, is plaintiffs asserted in the reply memorandum that the language in Chamberlain that the district court relied upon had been overruled. That's not the case. I would direct the court's attention to a footnote for the Planters case where they specifically reserved and said that they were not addressing the part that the district court relied upon. And also to the Daniels case, which says that Planters has largely been overruled itself. But so I wanted to make sure that the district court was correct when it said what it said, and it also ties in with what this court has said in Cordova, which is about speculation, creating a false issue. It's not just that it was self-serving. It is self-serving for a doctor to say, I'm gonna follow what is told to me in the label. Most doctors will say that, so they're not on the record of saying they wouldn't. So there's a self-serving element to it, but that's not the critical thing. The critical thing is the speculation. When somebody is looking back retrospectively and saying what they would have done, that's speculation, it's supposition. It's not a fact. It's not like the situations like in Feliciano. Council, that's always gonna be the case. It's a speculative endeavor by nature, but the only evidence we can have of that is the doctor's intent. It's hard for me to say that that is not evidence, that is evidence, that's not evidence that we must ignore because he simply answered a question of what I would have done if I had been given fact X. I understand what you're saying, Judge. And what I would say in response to that is, and this is exactly where the district court went with it, is that there might be some element of speculation that you can allow for, unless it's contradicted by all of his other behavior and testimony. What the district court was saying, I think is right, is that to the extent that the courts are willing to tolerate some speculation as part of that causation proving, it doesn't fit when Dr. Ferrante did not follow anything in the label. He didn't look at the label. He prescribed it off-label. He admits that he didn't consult it. He didn't do a renal evaluation beforehand. To my friend's statement that he knew from Dr. Young that renal testing had been done, that's not true. He said at page 91 of his deposition, he didn't know whether renal testing had been done at all by Dr. Young. Can you address another issue about causation, which I kind of thought it might be your stronger point, which was that Mr. Blackburn didn't keep his follow-up appointment with the doctor. And so kind of put the intermediary issue aside, just it seems like Mr. Blackburn would not have returned for tests anyway. What do you say about that? I agree with your honor. And the reason I was focusing on Dr. Ferrante is because we're really talking about the learned intermediary. The Mr. Blackburn's non-compliance is another reason and a valid reason why the court, even when it went beyond what approximate causation should be under weeks, that it found that Mr. Blackburn would not have complied. He failed to keep the appointment. He had an appointment in January of 2014 that he was supposed to go to. He didn't go to that. But that wasn't a testing appointment, was it? It was not, but he also, he knew he was supposed to have testing. I mean, he affirmatively said in his deposition, I was supposed to have renal evaluation. He never scheduled that. He never went to another gastroenterologist. He called to get the name of another gastroenterologist when he moved to Birmingham, never went to see him. And- Didn't he follow up with blood testing when Dr. Young had ordered it in 2012? He followed up on one occasion for a PSA test. That is correct, your honor. But if you look at the body of history- And didn't he testify? I read you the testimony. I gave you the site, but I'll refer to it again. Didn't he specifically testify that if he had, if he knew about and had been told about the testing that he would have done it, the every 30 days than the 90 days for a year that he would have done it? He did testify. And that, again, is self-serving speculation that is contrary to Mr. Blank or his history, your honor. Before you sit down, let me ask you to address one issue. So Weeks was a certified question from the federal court to the Alabama Supreme Court about innovator liability. Is there any, what do you think about the idea of us certifying a question to the Alabama Supreme Court about the underlying theory of plaintiff here about the testing versus the warning of the, just the risk? I see my time's up. Judge Breyer, may I answer your question? Well, technically, Judge Breyer's in charge of that, but I'm sure she- Oh, I'm sorry. I beg your pardon, Judge Breyer. For violating pro quo there. So the answer is, I think that the Supreme Court has spoken definitively, consistently, and recently what the parameters are of the learned intermediary doctrine and it is consistent with those you find in other jurisdictions. I don't think that there is need for any kind of certification here as this court found in Tutwiler. It is a longstanding, well-known doctrine in Alabama. Thank you, Mr. Peck. Mr. Waller. Thank you. Mr. Waller, you have three minutes left for rebuttal. Thank you, Your Honor. I think that Judge Luck has focused on the critical testimony and I agree with that where the evidence is, number one, he did get blood work before. He said he knew the instructions and followed them. And if they'd been different, he would have followed them. There's no basis to disregard that. And the January 14th visit is absolutely not. On the one hand, Shire says, get evaluated periodically. All the evidence is that that means a year, plus or minus. The January 14th visit was solely to see if he, that is, Mr. Blackburn was having an adverse reaction, symptoms like several, he could have had several different symptoms. It was not for the purpose of doing blood work. The evidence on that is unequivocal. So there is no nexus between a follow-up to see if you're having physically identifiable symptoms and whether he would have showed up for blood work at specified intervals if that had been in the label, particularly when, again, Shire says it ought to be periodically in a year. So in addition, another part of the literature that Amiri had touched on very briefly is you gotta show there would have been a better outcome. Dr. Winston's affidavit explains in the greatest detail that there would have been a better outcome because OCTASA testing would have detected Mr. Blackburn's injury before it progressed from acute to chronic and irreversible. Dr. Winston specifically explained that that likely would have been detectable in August of 2014. So there's clear evidence of a better outcome. With respect to Dr. Ferrante, what he says about labels is not speculation for this reason. He testifies throughout his 15, 17 years of practice. He has regularly followed labels. He's not talking about the Lealda label in isolation. He says he is aware of labels, he follows them, and they're important for safe use. So he is testifying not only about Lealda, but his pattern in practice. In our brief, we address why the off-label is not an issue. Their own expert, Dr. Bloomfield, says off-label is appropriate, and they had an SDR for off-label. Lastly, this point about him saying, the point that he didn't look at the label,  has no weight because he testified in detail. He was familiar with the label based on using it for years. He knew what the Lealda recommendation was. Thank you, Your Honor. Can I get you, before you just, to address the certified question issue? I mean, let's say we agreed with you that there was an issue of fact about causation. What would be your rather, would you rather us address the underlying sort of tort issue, the claim ourselves, or would you rather us try to certify that to the Alabama Supreme Court so that court could tell us what kind of claim needs to be made? I would say that because of HECS, because of the language in 65-501, the safe use regulation, that there'd be no basis for the court to agree as a matter of law with Mr. Peck. So I believe, respectfully, the court should agree, as Judge Proctor said, that it's not limited to a failure to warn. If you don't give instructions for use, that's actionable. But I would certainly understand, not understand, I mean, I don't think it's unreasonable to certify the question if that's what this court thinks is appropriate to do. I'm simply saying there's no basis to rule as a matter of law that drug AML liability is limited only to a failure to warn and where the patient would not have taken the drug. That is the case, as Judge Proctor said, in many instances, but there's no Alabama case that says an AML drug claim is limited to that circumstance  Thank you, Your Honor. Thank you, counsel. Your arguments have been very helpful. We appreciate it.